PATRICK MCGUIGIN  v.  JOHN OCHIGLEVICH.

One who pleads the illegality of the consideration of a promissory note, sued upon, must clearly establish it.

APPEAL from the Second District Court of New Orleans, *Whitaker*, J. *Field & Shackleford*, for defendant.

*N. H. Rightor, and Fellows & Mills, for plaintiff and appellant.*—On the 18th of February, 1862, the defendant executed his note for one thousand dollars, payable to his own order, and endorsed in blank. Plaintiff, as owner and holder, for a valuable consideration, of the note, brought this suit, wherein the defence set up rests on the allegation that the note was given in payment of work and material supplied for gunboat equipments destined to the use of the Confederate Government, an insurrectionary body, treasonably warring against the lawful authority of the National Government.

The lower Court held that "the evidence clearly shows that the respondent was a kind of contractor for this work, and that he used services and goods of plaintiff in the supplies furnished. The contract was not simply immoral, but it was one of a highly criminal character."

From the decision thus rendered we have taken this appeal.

Waiving all questions of fact, dismissing the legal question whether the payment by novation of the original debt for which the note was executed, did not cure any defect of original consideration, we shall address ourselves to the task of showing that, even if defendant can be allowed to allege his own turpitude in avoidance of the obligations of good faith, yet, that the learned Judge a quo has made a hasty and violent application of the familiar maxims of legal ethics enunciated in Art. 1887 of the Civil Code, the operation of which is regulated by the 19th Article of the Code of Practice. The decision to be rendered will be of vast importance, as fixing a precedent for the solution of numberless questions of a kindred nature which have arisen during our late troubles.

It is not pretended that there is anything inherently immoral or essentially criminal in the art of making sails, or in the act of selling canvas. The trade of sail-making is in itself an eminently useful and honorable one; it is indispensable to commerce, to science, to civilization. A contract to supply canvas and sails involves no patent turpitude, like a contract to rob, to murder, to commit arson, to abet treason, which would be on its face iniquitous, and for the enforcement of which the law grants no action. It is obvious, therefore, that a distinction is to be made between contracts immoral sui generis and those the object of which is to supply, or do something which, innocent in itself, is intended by one or both parties to subserve a purpose reprobated by law or by good morals.

Now, the case at bar, if it is at all affected by these principles, obviously comes under the second head of the distinction, and the plaintiff is denied all right of action for the recovery of money due on a contract for furnishing legitimate articles of commerce, because they are declared to have acquired an illicit character by reason of their destination, by the purchaser, to an unlawful purpose. The immoral character of the contract does not result from a simple inspection of its terms, but is remotely deduced by a process of reasoning and casuistry involving questions of motive and intention on the part of the vendor, and of knowledge on the part of the vendee. It is the alleged treasonable animus of defendant, known to plaintiff, which is supposed to have tainted the contract with immorality. It will certainly not be pretended that if plaintiff had been ignorant of the purpose to which the defendant destined the goods furnished, he would have forfeited his claim to compensation for their value, because it is only a criminal intention that can vitiate a contract otherwise legitimate and innocent. The whole inquiry, then, in cases of this kind, would turn upon questions of intention, and the investigation assumes a moral and metaphysical character. Attorneys at law become casuists. The Court is converted into a Synod of Theologians. The authority of Locke and Malebranche supersedes the authority of Pothier and Domat, and the judgment of the Court would present a solution of metaphysical problems, not a juridical sentence. It is obvious to what absurd consequences we are led by the doctrine of "intention" as taught by the lower Court. Civil magistrates should be content to limit their labors to the investigation and enforcement of civil contracts, and not complicate and confuse their duties by entering the labyrinth of subtleties in quest of hidden "intentions."

If the contract at issue in this case led, in its remote consequences, to the perpetration of a crime, there are means provided for the punishment of crimes, and the defendant who proclaims his guilt should surrender himself to the officers of the law. In the meantime, those hands stained with self-asserting treason, should not be lifted in an invocation for the spoils of the crime alleged to have been committed by the very party who meanly pleads his guilt as an excuse for the violation of plighted faith. But we deny that there was any immorality, still less, any crime, in the transaction of this business.

"The cause is illicit, where it is forbidden by law, when it is contra bonos mores or to public order." C. C. 1889.

Now the sale of canvas is not forbidden by law, the making of sails is not immoral, nor is there any thing subversive of public order in the equipment of a vessel. We must again revolve in the vicious circle of immoral intentions before we can condemn the contract and make the terms of the law fit the facts of the case. There being nothing in the contract contrary to good morals, it can only be avoided as violative of law or public order. This brings up the second branch of the argument, which is equally decisive in favor of plaintiff.

We contend that there was in the purposes and motives of the contract no such violation of law as would avoid it. Plaintiff sold the articles in question in the regular course of his business, and the laws in force at the time of the sale not only sanctioned the making of such contracts, but if plaintiff had refused to supply for an adequate consideration, the objects required by defendant, those laws would have compelled him to supply them. It is the sheerest nonsense to deny the historical and practical existence of the Confederate Government, at the period in question, or to affect ignorance of the fact, that it possessed not only all the outward characteristics of a de facto government, but all the powers necessary for the execution of its sovereign will within the limits of Louisiana. The power was for the time supreme and irresistible, and with few exceptions there was perfect submission to its will. The question of legitimacy has nothing to do here. We simply assert what is proven by the record, by the voice of contemporary history, by the general consent of mankind, by the action of foreign governments, by the action of our own Government, that the Confederate Government was in fact a Government. On the 18th of February, 1862, its presence and its power in New Orleans was as complete, as undisputed, and as legitimate as were the presence and the power of the British Government in the town of Castine, Maine, on the 2d September, 1814. There is an exact analogy between the two cases, and the principles settled by the Supreme Court in relation to the legal character of transactions which took place during the British occupation of Castine, are strictly applicable to the legal character of transactions which took place during the Confederate occupation of New Orleans. We refer your Honors to the celebrated and familiar case, the *United States* v. *Rice*, 4 Wheaton, 246. We are utterly unable to comprehend how the lower Court could have repudiated principles so clearly settled by Judge Story, and ignored the analogy which forces itself on our understanding. Paraphrasing the language of that illustrious Judge, we hold it to be undeniable that by the fact of secession New Orleans, and its inhabitants, "passed under a temporary allegiance to the Confederate Government, and were bound by such laws, and such only as it chose to recognize and impose. From the nature of the case, no other laws could be obligatory upon them ; for where there is no protection or allegiance, or sovereignty there can be no claim to obedience."

It is well settled in law, in reason and jurisprudence, that the validity and effect of a contract is to be determined by the law of the place where it was made. C. C. 10 ; C. P. 13 ; Henn. Obligations, VI, (a) 3.

That the law of a contract is that in force at the time it was entered into. Henn. Ibid. (b) 1.

We shall close with the following clinching exposition of the correct doctrines of law upon this question, by the great expounder of the British law :

"The true distinction seems to be, that the statute of Henry the Seventh does by no means command any opposition to a king de jure, but excuses the obedience paid to a king de facto. When, therefore, a usurper is in possession the subject is excused and justified in obeying and giving him assistance; otherwise, under a usurpation, no man could be safe; if the lawful prince had a right to hang him for obedience to the powers in being, as the usurper would certainly do for disobedience; nay, further, as the mass of people are imperfect judges of title, of which, in all cases, possession is prima facie evidence, the law compels no man to yield obedience to that prince, whose right is by want of possession rendered uncertain and disputable, till Providence shall think fit to interpose in his favor, and decide the ambiguous claim : and therefore, till he is entitled to such allegiance by possession, no treason can be committed against him."

LABAUVE, J. The plaintiff claims of the defendant the sum of one thousand dollars, on a note of the defendant, dated February 18th, 1862, payable sixty days from date.

The defence is, in substance, that the promissory note sued upon was made and delivered by defendant to the plaintiff, in consideration of work and labor done and performed by said plaintiff and said defendant, for and on account of sails and other canvas, made and delivered to the Confederate Government, which was then in open rebellion against the authority of the United States; and that the consideration was illegal.

The District Court gave judgment in favor of defendant, and plaintiff took this appeal.

The note sued upon reads as follows :

"$1,000. New Orleans, February 18th, 1862. Sixty days after date I promise to pay to the order of myself, one thousand dollars, value received, with eight per cent. interest, from date.

(Signed)                                         JOHN OCHIGLEVICH."

Endorsed : JOHN OCHIGLEVICH, ELLEN ⋈ OCHIGLEVICH.

The following receipt of the plaintiff adduced in evidence by defendant:

"Received, New Orleans, February 18th, 1862, from J. Ochiglevich, his two notes, endorsed by his wife, for sum of one thousand dollars each, payable in thirty and sixty days from date, for value received.

(Signed)                                         P. McGUIGIN."

The defendant admits the execution of the note, and the only defence made by him in his answer is as stated above; and it is incumbent on him to show clearly, and not probably, that the consideration of the note sued upon was, as stated in the answer, for work and labor done and performed by said plaintiff and said defendant for and on account of sails and other canvas made and delivered to the Confederate Government, who was then in open rebellion against the authority of the United States.

The testimony shows that the defendant and plaintiff were working, in the commencement of the year 1862, making sails, canvas, etc., for the gunboats then building for the Confederate Government.

The defendant has produced in evidence many receipts of the plaintiff, all dated in January, February or March, 1862, for different sums, some for *work and materials delivered,* some on *account,* some *in advance of canvas and labor to be done.*

All these receipts have no connection with and no reference to the note sued upon; the parol evidence makes no allusion to it. Must we presume, because plaintiff was working for the defendant in making sails and other canvas for the Confederate Government, that the note sued upon had no other consideration than that? There is nothing on the face of the note, or of the receipt for it, showing that it was given for anything connected with labor, or with the Confederate Government; both the note and receipt say for *value received.*

We are of opinion that the defendant has failed to prove the illegal consideration as by himself alleged in his answer.

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be annulled and avoided; and it is further ordered, adjudged and decreed, that the defendant pay to the plaintiff the sum of one thousand dollars, with interest at eight per cent. per annum from the 18th February, 1862, till paid, and costs of suit in both Courts.